**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| VALERIE RICHARDSON, | ) | 3:25-CV-00724 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIBERTY MUTUAL PERSONAL | ) | |
| INSURANCE COMPANY, | ) | March 24, 2026 |
| *Defendant*. | | |

**<u>RULING AND ORDER ON MOTION TO DISMISS</u>**

Sarala V. Nagala, United States District Judge.

In this insurance dispute, Plaintiff Valerie Richardson seeks payment from Defendant Liberty Mutual Personal Insurance Company for an unsatisfied $1,585,414.79 judgment she obtained in an underlying personal injury lawsuit against Liberty's insured, James J. Celentano, related to a motor vehicle collision. Mr. Celentano's insurance policy limit was $25,000. Standing in the shoes of Mr. Celentano, Plaintiff contends that Liberty's handling of her claim and actions in the underlying personal injury lawsuit render it directly liable to her for the full amount of the judgment pursuant to Connecticut's direct action statute, Conn. Gen. Stat. § 38a-321. Plaintiff alleges claims for breach of contract, negligence, bad faith, breach of fiduciary duty, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA") and the Connecticut Unfair Insurance Practices Act ("CUIPA"). *See* Am. Compl., ECF No. 25 at 9–22 (Counts 1–5).

Liberty has moved to dismiss the amended complaint in its entirety, arguing that Plaintiff has failed to state a claim on any of her five counts. Sec. Mot. to Dismiss, ECF No. 33. Plaintiff opposes the motion, Opp. to Mot. to Dismiss, ECF No. 36.

For the reasons described below, the Court finds that Plaintiff has stated plausible claims for relief as to all of her claims, except her breach of contract claim in Count One and portions of

her CUTPA/CUIPA claim in Count Five.  The motion to dismiss is thus GRANTED in part and DENIED in part.  Plaintiff is granted leave to amend Counts One and Five.

## I.    FACTUAL BACKGROUND

### A.  The Collision

On July 8, 2022, Plaintiff's vehicle was rear-ended by the vehicle of James J. Celentano while Plaintiff was stopped at a red light.  ECF No. 25 ¶¶ 4–5.  Plaintiff was transported to a hospital, where she received treatment for her injuries.  *Id.* ¶ 6.  Plaintiff was diagnosed by her orthopedist with a "massive rotator cuff tear," and was assessed as having a permanent five percent partial disability of her right shoulder and a permanent five percent partial disability of her lumbar spine.  *Id.* ¶ 15.  In the months after the crash, Plaintiff received continuing orthopedic and chiropractic treatment for significant pain, weakness, and limited range of motion associated with her injuries.  *Id.* ¶ 19.  Plaintiff's treating physician recommended that she undergo a "reverse shoulder replacement" procedure, and Plaintiff indicated she would do so.  *Id.* ¶ 15.

### B.  The Personal Injury Lawsuit and Settlement Efforts

At all relevant times, Mr. Celentano was insured by Liberty.  *Id.* ¶ 3.  Plaintiff's counsel provided Liberty with a notice of claim in September 2022 and with Plaintiff's medical records in March 2023.  *Id.* ¶¶ 7–8.  In April 2023, Plaintiff commenced an action against Mr. Celentano in Connecticut Superior Court ("the personal injury action").  *Id.* ¶ 9.

An employee of Liberty appeared on behalf of Mr. Celentano in the personal injury action and requested an extension of time to file a response, citing the need to complete an investigation to properly respond to Plaintiff's complaint.  *Id.* ¶¶ 11–12.[1]  Mr. Celentano's counsel filed an

---

[1] Based on the docket of the personal injury action, of which the Court may take judicial notice, *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006), the attorney who appeared for Mr. Celentano was Mary Ann McCluskey.  *See Richardson v. Celentano*, No. NNH-CV-23-6132120-S, Appearance for Defendant dated April 25, 2023.

answer to the complaint in the personal injury action approximately three months after the case was filed. *Id.* ¶ 13.

Plaintiff's personal injury counsel attempted to settle the personal injury action. On November 8, 2023, Plaintiff's attorney provided Liberty with additional medical records, demonstrating that Plaintiff had incurred nearly $12,000 in medical expenses to date, and that Plaintiff's orthopedist had recommended she undergo a costly reverse shoulder replacement procedure to treat her injury. *Id.* ¶ 15. Along with the records, Plaintiff's counsel made a time-limited offer of compromise in an amount equal to the limits of Mr. Celentano's Liberty insurance policy ($25,000).[2] *Id.* ¶ 16. Liberty's adjuster rejected the offer of compromise, stating that it would not accept unless Plaintiff underwent the shoulder surgery. *Id.* ¶ 22. Plaintiff alleges, upon information and belief, that Liberty did not communicate to Mr. Celentano that plaintiff had made it a time-limited offer to resolve the state court action within Mr. Celentano's policy limits. *Id.* ¶ 23.

Several months after Plaintiff's offer of compromise was rejected, Liberty's adjuster came back to Plaintiff's personal injury counsel in March of 2024 and offered to settle for the same amount ($25,000). *Id.* ¶ 25. Plaintiff did not accept.

Plaintiff alleges that Liberty thereafter engaged in bad faith conduct. Specifically, Attorney McCluskey—Mr. Celentano's counsel in the personal injury action, whom Plaintiff alleges is employed by Liberty—sent an email to Plaintiff's personal injury counsel that Plaintiff alleges was designed to "bully the Plaintiff into accepting" Liberty's untimely offer of the policy limit. *Id.* ¶

---

[2] Under Connecticut law, an offer of compromise remains open to the offeree for thirty days. Conn. Gen. Stat. § 52-192a(a). If a defendant rejects an offer of compromise and a plaintiff subsequently secures a recovery at trial that equals or exceeds the rejected offer, the plaintiff is entitled to 8% interest on the amount recovered by the plaintiff at trial. Conn. Gen. Stat. § 52-192a(c).

26. A copy of the email is attached as Exhibit A to the amended complaint.[3] In it, Attorney McCluskey expressed that Liberty felt Plaintiff's personal injury counsel was "intentionally prolonging the resolution of this matter in an obvious attempt to posture and threaten a meritless bad faith claim." Ex. A. to Am. Compl., ECF No. 29, at 2. Attorney McCluskey further invoked counsel's ethical obligations under Rules of Professional Conduct, and stated that any claim of bad faith (*i.e.*, a claim that would permit recovery above the policy limits) would be "completely meritless" and "ridiculous posturing." *Id.* The email stated that if Plaintiff refused to accept the offer equal to the policy limits, Liberty would move for sanctions against Plaintiff and her personal injury counsel. *Id.* at 2–3.

The personal injury matter proceeded to trial in February 2025. ECF No. 25 ¶ 29. Despite "numerous" additional settlement opportunities, and settlement recommendations from outside counsel and judges of the Connecticut Superior Court, Liberty declined to settle the case before or during trial. *Id.* ¶¶ 27–28. At trial, Mr. Celentano conceded liability, and the jury found in favor of Plaintiff. *Id.* ¶ 29. A judgment of $1,585,414.79 was ultimately entered in favor of Plaintiff against Mr. Celentano in March of 2025, comprising an award of economic and non-economic damages, plus interest. *Id.* ¶¶ 29–30. Postjudgment interest began to accrue on April 17, 2025, at a rate of 10% per year. *Id.* ¶ 31.

After the jury verdict, Liberty attempted to mail Plaintiff's personal injury counsel a check for the amount of the policy limits ($25,000), plus a portion of the interest that was included in the total judgment. *Id.* ¶ 32. Neither Plaintiff nor her personal injury counsel deposited these checks. *Id.*

---

[3] On a motion to dismiss, the Court may consider documents attached to the complaint or incorporated by reference. *See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc*., 369 F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

C.  The Present Action

Plaintiff filed the instant action in the Connecticut Superior Court on March 27, 2025.

Notice of Removal, ECF No. 1 at 7.  Liberty timely removed the action to federal court on the

basis of diversity jurisdiction, and then moved to dismiss the complaint.  Mot. to Dismiss, ECF

No. 19.  In response, Plaintiff filed the instant amended complaint, ECF No. 25, rendering the

original motion to dismiss moot.  Liberty then renewed its motion to dismiss, seeking dismissal of

each of the causes of action contained in the amended complaint.  ECF No. 33.

## II.    LEGAL STANDARD

A.  Motion to Dismiss

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), a plaintiff must allege "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In undertaking this analysis, the Court must

"draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual

allegations to be true, and determine whether they plausibly give rise to an entitlement to

relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks

and citation omitted).

However, the Court is not "bound to accept conclusory allegations or legal conclusions

masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause

of action will not do," *Iqbal*, 556 U.S. at 678.  Consequently, "[t]hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Ultimately, determining whether a complaint

states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

B. Applicable Law

Federal courts sitting in diversity apply the substantive law of the state in which they sit to outcome-determinative questions. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938). "Where there is no controlling case law from the state's highest court, a federal court sitting in diversity must predict how the highest court would resolve the issue." *Wilson v. Midway Games, Inc.,* 198 F. Supp. 2d 167, 176 n.27 (D. Conn. 2002) (citing *McCarthy v. Olin Corp.,* 119 F.3d 148, 153 (2d Cir. 1997)). Accordingly, this Court, sitting in diversity, applies Connecticut substantive law. Where necessary, it endeavors to predict how the Connecticut Supreme Court would resolve an issue of law.

## III. DISCUSSION

A. Direct Action Statute

Plaintiff brings each of her five claims pursuant to Connecticut's direct action statute, Conn. Gen. Stat. § 38a-321. The direct action statute permits Plaintiff to bring claims against Liberty to the same extent that Mr. Celentano, the insured, could sue Liberty if he had had to pay the judgment in the personal injury action. *See* Conn. Gen. Stat. § 38a-321; *Nash St., LLC v. Main St. Am. Assurance Co.*, 337 Conn. 1, 8 (2020) ("[O]ur direct action statute, § 38a-321 . . . places the plaintiff in the shoes of the insured, subject to all the same rights and protections as the insured.").

A plaintiff must make three showings to state a claim under the direct action statute: "(1) that the plaintiff has recovered a final judgment; (2) that the judgment is against a person who was insured by the defendant against liability on it; and (3) that the judgment remains unsatisfied." *Veilleux v. Progressive Nw. Ins. Co.*, No. 3:16-CV-02116 (MPS), 2018 WL 465773, at *3 (D.

6

Conn. Jan. 18, 2018) (citation omitted)).  Assuming the truth of Plaintiff's allegations, she has

satisfied all three elements.  *See* ECF No. 25 ¶¶ 29–30 (alleging recovery of a final judgment); ¶¶

3, 34–35 (alleging Mr. Celentano was, indeed, insured by Liberty); ¶ 32 (alleging Liberty

attempted to send checks that did not satisfy the judgment).  Thus, the Court considers whether

each of the substantive counts alleged in the amended complaint pursuant to the direct action

statute state a plausible claim for relief. *See Fleming v. Gov't Emps. Ins. Co.*, 86 F. Supp. 3d 102,

107 (D. Conn. 2015) (evaluating applicability of direct action statute, then whether the plaintiffs

stated a claim "with respect to the underlying tort"); *Brown v. Employer's Reinsurance Corp.*, 206

Conn. 668, 673 (1988).

B.  Count One:  Breach of Contract

First, the Court holds that Plaintiff has not adequately alleged a breach of contract claim

against Liberty. [4]

Under Connecticut law, the elements of a breach of contract action are "formation of an

agreement, performance by one party, breach of the agreement by the other party, and damages."

*Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C*., 311 Conn. 282, 291 (2014).  The

parties do not dispute that Plaintiff has alleged an agreement was formed; that Mr. Celentano, the

insured, performed his duties under the agreement; or that there are damages.  Thus, it is the third

---

[4] Plaintiff's assertion that Liberty waived its ability to challenge her breach of contract claim on these grounds is unavailing.  It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.  *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000).  Indeed, Plaintiff acknowledged that her amended complaint rendered Liberty's original motion to dismiss moot.  *See* Response to Mot. to Dismiss, ECF No. 26 (requesting the motion be denied as moot).  Thus, Liberty is permitted to raise new arguments in response to Plaintiff's amended complaint.  And, in any event, Plaintiff's original complaint identified Count One as merely "Direct Action per C.G.S § 38a-321," and recited facts supporting a claim of direct liability under the direct action statute (*i.e.*, that the plaintiff has recovered a final judgment against a person who was insured by the defendant against liability on it, and that the judgment remained unsatisfied).  *See* ECF No. 1 at 7–8.  The original complaint did not clearly allege contract formation, performance, or breach.  *Id.*  Where it is not clear a breach of contract claim was alleged in the first instance, the Court cannot find that Defendant's argument regarding breach "could have been made in an original motion to dismiss" and therefore is waived.  *Cf.  Falcon v. City Univ. of New York*, No. 15-CV-3421 (ADS) (ARL), 2016 WL 3920223, at *13–14 (E.D.N.Y. July 15, 2016).

element—whether Liberty breached a duty owed to Mr. Celentano—that is central to Liberty's motion to dismiss this claim.

Plaintiff concedes that she alleges no specific contractual provision in the insurance contract between Mr. Celentano and Liberty that that she claims Liberty breached. Instead, she contends that she has sufficiently pleaded a contractual *obligation*, which is all that is required under Connecticut law. She is correct on this point. *See Commissioner of Labor v. C.J.M. Serv's, Inc.*, 268 Conn. 283, 294 (2004) (recognizing that the "specific terms of a contract" need not always be alleged for a claim sounding in contract law to survive a motion to dismiss). But each of the general contractual obligations Plaintiff claims were breached do not suffice to state a claim for breach of contract, for the following reasons.

First, Plaintiff's allegation that Liberty breached its contract with Mr. Celentano "by failing to resolve the Plaintiff's claim within the limits of the insurance policy" cannot plausibly be stated without reference to a contractual obligation that would have required Liberty to have resolved the claim within the limits of the policy. *See* ECF No. 25 ¶ 36. Plaintiff does not ground this alleged breach in the language of the contract or any other obligation recognized by Connecticut law.

Plaintiff's remaining breach of contract theories each rely on an implied duty on the part of an insurer to exercise due care in some fashion—for instance, to exercise due care in handling a case against its insured, to respond to a claim against its insured, and to resolve a claim against its insured. *Id.* ¶¶ 37–39. The last of these theories overlaps with Plaintiff's theory that Liberty had a duty to resolve the claim within the policy limits, as discussed above. But it is not clear to the Court that any of these theories are recognized contractual duties under Connecticut law.

First, Connecticut courts have long been reluctant to recognize implied contractual duties. "An insurance policy is a contract and the risks covered by the policy are determined by the

intention of the parties as manifested in the contract. A person bargains for a certain protection when taking out insurance, and the insurer, for a consideration, agrees to furnish that protection. The insurer is bound by the express terms its contract, but liability beyond those terms is not to be extended by implication." *Ryiz v. Federal Ins. Co.*, 5 Conn. App. 179, 182–83 (1985) (citation omitted). The only implied contractual duty that Connecticut law unambiguously recognizes is the duty of good faith and fair dealing. *See Capstone Bldg. Corp. v. Am. Motorist Ins. Co.*, 308 Conn. 760, 794 (2013). And Connecticut law characterizes that duty as requiring a showing of bad faith, which has not been pleaded in Count One. *Id.* at 795 ("Bad faith means more than mere negligence; it involves a dishonest purpose.") (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432–33 (2004)).

The Court recognizes that federal district court opinions have suggested that an insurer may be held liable in contract for failure to exercise due care in settlement. *Smith v. Home State Ins. Co. SPC, Inc.*, No. 3:10-CV-1046 (RNC), 2013 WL 12284914, at *3 (D. Conn. Mar. 31, 2013) (citing *United Servs. Auto. Ass'n v. Glens Falls Ins. Co.*, 350 F. Supp. 869, 871 (D. Conn. 1972)) (where an insurer "fails to exercise good faith or due care in its consideration of an offer of settlement, [it] may be held liable under causes of action which sound in tort or in contract, or both"). But these cases do not explain the source of any such contractual duty. The Second Circuit, for its part, has recognized that claims alleging a duty to exercise good faith or reasonable care with respect to opportunities to settle within policy most often sound in tort, but may also be "based on an expansive reading of the contractual obligation to protect up to the agreed limits." *Bourget v. Gov't Emp. Ins. Co.*, 456 F.2d 282, 285 (2d Cir. 1972).

The only Connecticut appellate court opinion Plaintiff cites on this issue addresses an insurer's liability for failing to settle a claim under a reasonable care standard without specifying

9

the nature of the cause of action under which liability was pursued. *Hoyt v. Factory Mut. Liability Ins. Co. of Am.*, 120 Conn. 156, 179 A.2d 842, 843 (Conn. 1935). And, indeed, *Hoyt* discusses the duty of reasonable care only after citing to a specific contractual provision prohibiting the insured from "settl[ing] any claim except at his own cost or interfer[ing] with any negotiation for settlement or any legal proceeding." *Id.*; *see also Bartlett v. Travelers' Ins. Co.*, 167 A. 180, 181–83 (Conn. 1933) (analyzing similar policy language). The Court is therefore unconvinced that Connecticut courts would recognize a breach of contract claim based on an alleged failure to use due care in handling and settling a claim, without tethering the duty to the policy in some fashion. Plaintiff's allegation that Liberty's duties to Mr. Celentano "included a duty to resolve the Plaintiff's claim against the insured within the policy limits," ECF No. 25 ¶ 48, is merely conclusory. The Court recognizes, however, that Plaintiff may be able to locate the source of the duty within the insurance policy, construed broadly, if she is permitted to amend her complaint. *See Bourget*, 456 F.3d at 285.

Accordingly, Count One is dismissed with leave to amend.

C.  Count Two: Negligence

Plaintiff's negligence claim, which alleges that Liberty negligently failed to settle and exposed its insured to an excess judgment, survives dismissal.

As an initial matter, the parties do not dispute that Liberty owed a duty of reasonable care to Mr. Celentano sounding in tort. *See Smith*, 2013 WL 12284914, at *3; *United Servs. Auto. Ass'n*, 350 F. Supp. at 871; *Knudsen v. Hartford Acc. & Indem. Co.*, 26 Conn. Supp. 325, 328 (Com. Pl. 1966) ("The standard of due care would seem to require that the insurer cannot be too venturesome and speculate with the trial of the issue in an accident case at the risk of the assured"); *Carford v. Empire Fire & Marine Ins. Co.,* No. CV065001946, 2012 WL 4040337, at *4 (Conn. Super. Ct. Aug. 21, 2012) ("Connecticut has long recognized a cause of action for negligent failure

to settle a claim"); *The Capitol Fuel Co. Inc. v. New York Cas. Co.,* 16 Conn. Supp. 155, 158 (Com. Pl. 1949) ("From all the pertinent literature enjoyed by the court, it is concluded that the trend of judicial and text opinion favors . . . holding an insurer accountable for want of due care in handling a case against its assured").

Liberty instead contends that Plaintiff's negligence claim is barred by the economic loss doctrine. "The economic loss doctrine bars negligence claims for commercial losses arising out of the defective performance of contracts . . . The rationale for the doctrine is that, because parties to a contract are free to allocate the risks, insure against potential losses, and adjust the contract price as they deem most wise . . . courts will not extricate them from their bargain and substitute a common-law tort remedy." *McCarter & Eng., LLP v. Jarrow Formulas, Inc.,* 351 Conn. 186, 193 n.2 (2025) (quoting *Ulbrich* v. *Groth*, 310 Conn. 375, 390 n.14 (2013) (citations omitted; internal quotation marks omitted)). The Connecticut Supreme Court has never applied the economic loss doctrine in the insurance context. In the absence of controlling authority, the Court must predict whether the Connecticut Supreme Court would apply the doctrine in this case, if given the opportunity. It concludes that it would not.

First, Connecticut has thus far declined to apply the economic loss doctrine outside of the context of the Uniform Commercial Code ("UCC"). The Connecticut Supreme Court has held that the doctrine governs disputes between sophisticated parties relating to business relationships governed by the UCC. *See Flagg Energy Development Corp. v. General Motors Corp.*, 244 Conn. 126, 153–54 (1998), *overruled in part by Ulbrich*, 310 Conn. 375; *see also Am. Progressive Life & Health Ins. Co. of New York v. Better Benefits, LLC*, 292 Conn. 111, 119 (2009) (declining to decide whether the economic loss doctrine should be expanded "to business relationships that are not regulated by the UCC"). And insurance contracts are distinct from "ordinary commercial

contract[s]" because there is a "special relationship . . . between the insurer and the insured." *Jarrow*, 351 Conn. at 200, 201 n.3.   Specifically, the interests of the insurer and the insured may be at odds, given that the "payment of a claim benefits the insured and diminishes the resources of the insurer."  *Id.* at 198 (quoting *Barry* v. *Posi-Seal International, Inc.*, 40 Conn. App. 577, 672, *cert. denied*, 237 Conn. 917 (1996)).   The "'unequal bargaining power'" often present in the insurer-insured relationship also counsels against applying a doctrine founded upon the assumption that both parties freely negotiated the risks and costs of their contract.  *See Hartford Roman Cath. Diocesan, Corp. v. Interstate Fire & Cas. Co.*, 199 F. Supp. 3d 559, 599 (D. Conn. 2016), *aff'd,* 905 F.3d 84 (2d Cir. 2018) (explaining the duty of good faith and fair dealing); *see also Grand Sheet Metal Prods. Co. v. Prot. Mut. Ins. Co.*, 34 Conn. Supp. 46, 51 (Conn. Super. Ct. 1977) (recognizing "the unequal bargaining power of the parties" and allowing a claim for breach of the implied covenant of good faith and fair dealing).

Further, Connecticut law regards the economic loss doctrine as "merely another way of saying that the defendant[] owed no duty to the plaintiff."  *Raspberry Junction Holding, LLC v. Se. Conn. Water Auth.*, 340 Conn. 200, 211–12 (2021) (quoting *Lawrence v. O & G Indus., Inc.*, 319 Conn. 641, 648 n.8 (2015)).[5]  "An injury is remediable in tort," and thus not barred by the doctrine, "if it traces back to the breach of a tort duty arising independently of the terms of the contract."  *Id.* (quoting *Eastwood* v. *Horse Harbor Foundation, Inc*., 170 Wash. 2d 380, 389, (2010)) (cleaned up); *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 579 (1995) (plaintiffs are "not barred from pursuing a negligence claim solely because they also might have had a breach of contract claim").   In keeping with this principle, Connecticut permits punitive

---

[5] *Raspberry Junction Holding, LLC*, characterizes the economic loss doctrine as reflecting "the principle that a plaintiff cannot sue in tort for purely monetary loss unaccompanied by physical injury or property damage."  340 Conn. at 202 (quoting *Raspberry Junction Holding, LLC* v. *Se. Conn. Water Authority*, 331 Conn. 364, 368 n.3 (2019)).

12

damages in breach of contract cases—but only where "the conduct constituting the breach is also a tort for which punitive damages are recoverable." *Jarrow*, 351 Conn. at 210 n.7; *see also Edible Arrangements Int'l, Inc. v. Chinsammy*, 446 F. App'x 332, 333–34 (2d Cir. 2011) ("In Connecticut . . . punitive damages are not ordinarily available in a breach of contract case unless the breach is 'founded on tortious conduct'") (quoting *L.F. Pace & Sons, Inc. v. Travelers Indem. Co.,* 9 Conn. App. 30, 48 (1986)).[6]   The Connecticut Supreme Court reached its holding in *Jarrow* over an objection that such a result would "violate the economic loss doctrine." *See id.* at 193.   It follows from these cases that, because Connecticut recognizes an independent tort claim against an insurer for negligent failure to settle, such a claim would not be barred by the economic loss doctrine.

This Court respectfully disagrees with the holding in *Fleming*, insofar as it concluded that Connecticut law required the application of the economic loss doctrine to bar a claim for negligent failure to settle.  86 F. Supp. 3d at 108.  *Fleming* found that *Ulbrich*  and a Connecticut Superior Court opinion favored the application of the doctrine.  *Id.* (citing *Ulbrich*, 310 Conn. at 404, and *Akl v. Trumbull Ins. Co.,* No. MMX-CV-136010186, 2014 WL 1345257, at *4 (Conn. Super. Ct. Mar. 13, 2014)).  But *Ulbrich* was decided in the context of a transaction conducted pursuant to Article 9 of the UCC, and thus does not, by itself, suggest that the economic loss doctrine applies to insurance contracts.  *See Ulbrich*, 310 Conn. at 402.  And although the Connecticut Superior Court has applied the doctrine to insurance contracts, they do so largely based on the policy rationale that insurers must be able to "allocate risk and limit potential liability by contract terms."

---

[6] The notion that punitive damages may be awarded where the same conduct constitutes a breach and a tort is most firmly established in insurance disputes.  In reaching its holding in *Jarrow*, the Supreme Court acknowledged that *L.F. Pace & Sons* "allowed for the possibility" of punitive damages in the case of a tortious breach in "the insurance context." *Jarrow*, 351 Conn. at 193.  It also noted that other lower court decisions had most often awarded such punitive damages in insurance cases precisely because an insurer-insured relationship is not a typical economic relationship. *Id.* at 200 ("Some of our lower courts have allowed punitive damages for breach of contract claims, but they have largely limited the award of those damages to the insurance and surety contexts, given the special relationship that exists between the insurer and the insured.").

*Akl*, 2014 WL 1345257, at \*4 (quoting *First Am. Title Ins. Co. v. 273 Water Street, LLC*, No. HHD-08-4041234-S, 2010 WL 6496185, at \*6 (Conn. Super. Ct. Aug. 30, 2010)).  This policy rationale stands in tension with the cases that recognize insurers and insureds have unequal bargaining power, which is well-recognized by Connecticut appellate cases, as noted above. Finally, insofar as Connecticut recognizes an insurer's independent duty in tort to use reasonable care in settling an insured's claim, the negligence claim would not be wholly dependent on the contractual relationship, as found in *Fleming*.  *Cf.* 86 F. Supp. 3d at 108.   Accordingly, this Court declines to follow *Fleming*, and holds that the economic loss doctrine does not bar Plaintiff's negligence claim.

D.  <u>Count Three:  Bad Faith</u>

Next, the Court concludes that Plaintiff's allegations regarding Liberty's handling of her claim against Mr. Celentano are sufficient to state a claim for bad faith.  At oral argument, Plaintiff clarified that, although labeled "bad faith," this claim could alternatively be labeled a claim for breach of the implied covenant of good faith and fair dealing.  *See PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279, 296 n.7 (2004) (Connecticut law uses the terms "'bad faith,' 'lack of good faith' and 'breach of the covenant of good faith and fair dealing' interchangeably.").

Connecticut law recognizes an independent cause of action in tort "arising from an insurer's common law duty of good faith [and fair dealing]." *Buckman v. People Express, Inc.,* 205 Conn. 166, 170 (1987).  The "duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  *Capstone Bldg. Corp.*, 308 Conn. at 794; *see Veilleux*, 2018 WL 465773 at \*5. To plead a cognizable claim for bad faith, the plaintiff must allege that "'the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably

14

expected to receive under the contract were taken in bad faith.'" *Veilleux*, 2018 WL 465773 at *5 (citation omitted) (quoting *De La Concha*, 269 Conn. at 433); *Capstone Bldg. Corp.*, 308 Conn. at 798 ("[B]ad faith is not actionable apart from a wrongful denial of a benefit under the policy").

Bad faith conduct is distinguishable from negligent conduct in that it "contemplates a state of mind affirmatively operating with some design or motive of interest or ill will." *Chapman v. Norfolk & Dedham Mut. Fire Ins. Co.*, 39 Conn. App. 306, 320 (1995). Bad faith may include "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *De La Concha of Hartford, Inc.*, 269 Conn. at 433; *Elm St. Builders, Inc. v. Enter. Park Condo. Ass'n, Inc.*, 63 Conn. App. 657, 667 (2001) (citing as examples of bad faith "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.") (citation omitted).

An insurer "is generally held liable to the assured for fraud or bad faith in failing or refusing to compromise or settle claims within the policy limit." *Bartlett*, 167 A. at 183; *Curry v. State Farm Fire & Cas. Co.*, No. 24-CV-1619 (SFR), 2025 WL 1616627, at *6 (D. Conn. June 6, 2025) (failure to "adequately investigate, evaluate and settle may provide the basis for a bad faith claim," while allegations of a "mere coverage dispute" or negligent investigation will not state a claim for bad faith) (citations omitted); *Smith*, 2013 WL 12284914, at *4 (collecting cases)); *Gen. Acc. Grp. v. Gagliardi*, 593 F. Supp. 1080, 1088 (D. Conn. 1984) ("As the insurer has the sole right to settle claims, within the limits of the policy, it is obliged to exercise that right in a reasonable and prudent manner.") (citing *Bartlett*, 167 A. at 180), *aff'd sub nom. Gen'l Accident Grp. v. Gagliardi*, 767 F.2d 907 (2d Cir. 1985).

Plaintiff has alleged sufficient conduct engaged by Liberty to state a plausible claim for bad faith, although this is a close question. Plaintiff alleges that Liberty "knowingly and intentionally declin[ed] to meet a reasonable insurance consumer's expectations," including by failing to reasonably investigate Plaintiff's claim and declining to "effectuate prompt, fair and equitable settlement of a claim in which liability had become reasonably clear." ECF No. 25 ¶¶ 67(f) & (g). These claims are supported by examples of specific conduct allegedly impeding Mr. Celentano's right to receive benefits that he reasonably expected to receive under the contract. Liberty declined to accept Plaintiff's $25,000 offer of compromise (equal to the policy limit) even though her damages were likely to exceed that amount, and indicated it would not pay the policy limits unless Plaintiff received costly shoulder surgery. And when Liberty rejected Plaintiff's offer of compromise in November 2023, it "had received medical records documenting that Plaintiff had required medical treatment, not only in the form of ambulance and [e]mergency [r]oom care immediately after the crash, but also orthopedic and chiropractic treatment for months thereafter." *Id.* ¶ 19. These medical expenses alone approached $12,000, nearly half the policy limit. *Id.* Moreover, Plaintiff provided an MRI report and recommendation by Plaintiff's treating physician that she undergo surgery, as well as proof of 5% permanent loss of function in her shoulder and back. *Id.* ¶¶ 15, 19–20. Plaintiff alleges that this information demonstrated that "fair compensation was very likely to exceed the coverage limit—and by a wide margin." *Id.* ¶ 21. Plaintiff asserts that by not formally accepting (i.e., effectively declining), Liberty was attempting to resolve a case that "unquestionably implicated its policy limits for a sum less than it owed on behalf of its insured." *Id.* ¶ 22. Further, by declining the offer, Liberty exposed Mr. Celentano to interest at a rate of eight percent on the amount awarded at trial. Conn. Gen. Stat. § 52-192a(c); ECF No. 25 ¶ 30.

16

In March of 2024—in the apparent absence of any changed circumstances or additional information—Liberty came back and offered its policy limits. *Id.* ¶ 25. It did so only mere months after rejecting the very same offer, *knowing* its prior rejection carried a penalty for its insured. In other words, Liberty's settlement strategy put its insured in an affirmatively worse bargaining position. Plaintiff rejected this offer. *Id.* Liberty responded to Plaintiff's counter-offer of $450,000 not with a counter-offer of its own, but with threats to file grievances against Plaintiff's personal injury counsel and seek sanctions against that counsel and Plaintiff herself. ECF No. 29 at 2–3.[7] Thereafter, Liberty repeatedly declined to settle for anything more than the policy limits, despite the recommendations of outside counsel and judges of the Connecticut Superior Court. ECF No. 25 ¶ 28.

Drawing all reasonable inferences in Plaintiff's favor, as the Court must at this stage, these allegations support an inference that Liberty failed to settle in bad faith. Of course, the mere allegation that an insurance company acted with the intent to "further its own financial interest" is insufficient to show a bad-faith motive. *See Connecticut Mun. Elec. Energy Coop. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 3:19-CV-839 (JCH), 2020 WL 6888272, at *12 (D. Conn. Jan. 17, 2020). But Plaintiff plausibly alleges that Liberty willfully refused to perform its obligation to reasonably settle, knowing it was exposing its insured to an excess verdict. *See Elm St. Builders*, 63 Conn. App. at 667. Liberty's refusal to settle for the policy limits in the fall of

---

[7] Liberty argues that this correspondence may not be considered in light of the litigation privilege (also known as absolute immunity). The litigation privilege bars legal claims "premised on factual allegations that challenge the defendant's participation in a properly brought judicial proceeding." *Scholz v. Epstein*, 341 Conn. 1, 14 (2021). Originally applied in the context of defamation claims, it is designed to bar "retaliatory civil actions" against "participants in judicial proceedings, including judges, attorneys, parties, and witnesses," to promote these parties' "participation and candor." *MacDermid, Inc. v. Leonetti*, 310 Conn. 616, 627–28 (2013). Liberty points to no Connecticut cases in which the doctrine has been used to prohibit the introduction of pieces of *evidence*, such as this email—as opposed to barring entire claims for relief premised on communications made in the course of judicial proceedings. Here, Plaintiff's bad faith claim is also premised on actions outside of this single communication, and Liberty does not argue otherwise. Accordingly, the Court considers this correspondence for the purposes of the motion to dismiss.

2023, only to come back and offer the exact same amount in the spring of 2024, supports an inference at the pleading stage that Liberty had no good reason to decline the offer of compromise in the first place. And the threatening email attached to the complaint goes beyond mere posturing to further indicate Liberty's "interested or sinister" intent to force Plaintiff to settle for an unreasonably low amount. *See De La Concha*, 269 Conn. at 433.

Accordingly, Plaintiff's factual allegations suggest that Liberty's conduct crossed the line from mere negligence into bad faith, and her bad faith/breach of the implied covenant of good faith and fair dealing claim will not be dismissed.

E. Count Four: Breach of Fiduciary Duty

Next, Plaintiff has stated a claim for breach of fiduciary duty arising from Liberty's alleged failure to protect Mr. Celentano's interests in the underlying personal injury action.

Under Connecticut law, a claim for breach of fiduciary duty generally requires that a plaintiff "prove: '(1) the existence of a fiduciary relationship, giving rise to a duty; (2) breach of that duty; (3) causation; and (4) damages." *Roumeliotis, Tr. for Nash Engineering Co. v. Nordenson*, No. 3:23-CV-01366 (JCH), 2024 WL 3429424, at *11 (D. Conn. July 15, 2024) (quoting *Barash v. Lembo*, 348 Conn. 264, 301 (2023) (cleaned up)). Plaintiff has plausibly pleaded all four elements.

First, the Court finds that Connecticut would treat the relationship between Liberty and Mr. Celentano as a fiduciary relationship, at least in matters relating to the litigation and settlement of the underlying personal injury action. The Connecticut Supreme Court has recognized that "an insurer generally has a fiduciary relationship with its insured." *State v. Acordia, Inc.*, 310 Conn. 1, 37 (2013) (citing *Hutchinson v. Farm Family Cas. Ins. Co.*, 273 Conn. 33, 53 (2005) (Norcott, J., dissenting) ("American jurisprudence . . . has long recognized that an insurer and its insured have a special relationship; that is characterized by elements of public interest, adhesion and

18

fiduciary responsibility. These characteristics, along with unequal bargaining power, leave insureds no choice but to depend on the good faith and performance of the insurer.") (internal quotation marks and citations omitted)); *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 640 (2002) ("a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other").

While Connecticut courts have found the insurer-insured relationship to be commercial rather than fiduciary in certain contexts, such as where an insurer advises an insured on purchasing a particular policy, they have recognized the existence of a fiduciary relationship in situations where the insured is reliant upon the insurer to protect its interests. *Compare Macomber*, 261 Conn. at 641 (characterizing the relationship as "commercial . . . in the context of purchasing a policy") and *Hutchinson*, 273 Conn. at 47 (finding no fiduciary duty "where the relationship between the insured and the insurer is adversarial at the inception of a claim") *with Acordia*, 310 Conn. at 37. Specifically, courts draw a distinction between coverage disputes between insurer and insured, and situations—such as this case—involving third-party claims. *See Hutchinson*, 273 Conn. at 47; *Bristol Heights Assocs., LLC v. Chicago Title Ins. Co.*, 950 F. Supp. 2d 408, 417–18 (D. Conn. 2013) ("an insurer defending its insured against a third-party claim incurs a duty to exercise the requisite level of care and diligence in litigating") (citing *Hutchinson*, 273 Conn. at 47); *Sheltry v. Unum Life Ins. Co. of Am.*, 247 F. Supp. 2d 169, 179 (D. Conn. 2003) (distinguishing "circumstances . . . dealing with third-party claims, in which fiduciary-like duties may be placed on the insurer to benefit the insured," from "first party disputes between insurer and insured," in which a fiduciary relationship does not exist). In defending its insured against a third-party claim, the insurer has such a "superior knowledge, skill or expertise and . . . a duty to

19

represent the interests of" the insured as to give rise to a fiduciary duty flowing from insurer to insured. *See Macomber*, 261 Conn. at 640.

Here, where Liberty was tasked with handling Plaintiff's third-party claim, and later undertook to defend Mr. Celentano in the litigation and attempted settlement of the underlying personal injury action, the Liberty-Celentano relationship is properly considered fiduciary rather than commercial. *See* ECF No. 25 ¶¶ 71–72 (Liberty was "under a legal duty to represent the interests" of Mr. Celentano and owed him "a duty of loyalty and a duty to protect his interests" in the personal injury action). That relationship carries, at the very least, "a continuing duty to use the degree of care and diligence a person would exercise in the management of his or her own business." *Hutchinson,* 273 Conn. at 47; *cf. Perry v. Gov't Emps. Ins. Co.*, 660 F. Supp. 3d 159, 167 (D. Conn. 2023) (declining to find a fiduciary relationship where the insured "ma[de] no [allegations] of a unique degree of trust and confidence between the plaintiff and the defendant akin to a fiduciary or special relationship") (internal citation and quotation omitted).[8]

As to the second, third, and fourth elements—breach, causation, and damages—Plaintiff has adequately pleaded each one. Specifically, Plaintiff alleges facts supporting an inference that Liberty did not protect Mr. Celentano's interests in unreasonably refusing to accept Plaintiff's offer of compromise, and failing to resolve the personal injury action outside of trial where liability had become reasonably clear. *See* ECF No. 25 ¶¶ 19–21 ("Liability was obvious . . . and fair compensation was very likely to exceed the coverage limit . . . There was no reasonable basis to decline to accept the [offer of compromise]"); 25 ("Liberty refused to offer its policy limits" until

---

[8] The Court need not base this holding on Plaintiff's assertion that Defendant and Mr. Celentano had an attorney-client relationship. Defendant's role in handling, and later defending, Plaintiff's third-party claim against Celentano supports a finding that fiduciary duties ran from Defendant to Mr. Celentano. And although Liberty and Mr. Celentano (through Plaintiff) are adverse in the present litigation, this is not the proper inquiry: the Court assesses whether Liberty owed Mr. Celentano a fiduciary duty while handling Plaintiff's third-party claim and during the underlying personal injury lawsuit.

March of 2024); 27–29 ("Liberty refused to offer a penny more than $25,000 through trial," despite being "presented with a number of reasonable settlement figures, which were recommended by judges of the Superior Court and by outside counsel . . . Instead, Liberty exposed its insured to a trial that was certain to result in a judgment in excess of the policy limits"); 73(b–g).  Taken as true, Liberty's alleged conduct does not reflect "the degree of care and diligence a person would exercise in the management of his or her own business." *Hutchinson*, 273 Conn. at 47.

Therefore, Plaintiff plausibly alleges a claim for breach of fiduciary duty.

F.  Count Five:  CUTPA Violations

Plaintiff likewise succeeds in stating a claim under CUTPA and CUIPA, in part.

CUTPA  prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," Conn. Gen. Stat. § 42-110b(a), and provides a private right of action for persons who are injured by such unlawful behavior.  Conn. Gen. Stat. § 42-110g; *New Eng. Sys., Inc. v. Citizens Ins. Co. of Am.*, No. 3:20-CV-01743 (JAM), 2021 WL 1978691, at *2 (D. Conn. May 17, 2021). CUIPA, on the other hand, specifically targets "unfair or deceptive practices specific to the business of insurance." *New Eng. Sys., Inc.*, 2021 WL 1978691, at *2 (citing Conn. Gen. Stat. § 38a-815 *et seq.*).  Although CUIPA does not contain its own private right of action, a private plaintiff may utilize CUTPA's enforcement provision to assert a claim based on one of several separate acts or practices that are "statutorily defined as 'unfair and deceptive acts or practices in the business of insurance.'"  *Id.*; *see also Thomas v. Vigilant Ins. Co.*, 594 F. Supp. 3d 499, 511 (D. Conn. 2022); *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 165 (D. Conn. 2014).  To prevail on this type of CUTPA claim, "a plaintiff must show that the defendant engaged in an act prohibited by CUIPA's substantive provisions, and that the act proximately caused the harm alleged." *Thomas*, 594 F. Supp. 3d at 511 (quoting *Belz*, 46 F. Supp. 3d at 165) (quotation marks omitted).

21

Plaintiff alleges that Liberty violated Conn. Gen. Stat. § 38a-816(6), which sets forth several ways in which an insurer may engage in unfair claim settlement practices.  A claim premised upon an insurer's claims settlement practices pursuant to § 38a-816(6) requires a plaintiff to "allege that the 'defendant has committed the alleged wrongful acts with such frequency as to indicate a general business practice.'"  *Traylor v. Awwa*, 899 F. Supp. 2d 216, 226 (D. Conn. 2012) (quoting *Quimby v. Kimberly Clark Corp.*, 28 Conn. App. 660, 672 (1992)).

### 1.  Substantive CUIPA Violations

The Court holds that Plaintiff has adequately alleged one unfair claims settlement practice, under § 38a-816(F), but not others.

First, Plaintiff successfully alleges that she was subjected to business practices prohibited by Conn. Gen. Stat. § 38a-816(6)(F), which prohibits "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Plaintiff does not "generally recite[] the unfair settlement practices enumerated in [the statute]," but rather alleges facts that align with the practices prohibited.  *Cf. Ramos v. AmGuard Ins. Co.*, 747 F. Supp. 3d 389, 397 (D. Conn. 2024).

Plaintiff alleges that liability was reasonably clear at the time she made the offer of compromise because Liberty knew Mr. Celentano rear-ended Plaintiff's vehicle while she was stopped at a red light.  ECF No. 25 ¶ 19.  Liberty does not contest that inference.  And Liberty's failure to "attempt[] in good faith to effectuate prompt, fair and equitable settlement[]" in this case turns on the same facts analyzed with respect to Plaintiff's claim for bad faith above.  *Harrigan v. Fid. Nat'l Title Ins. Co.*, 214 Conn. App. 787, 804 (2022) (noting that "subdivision (F)" contains an "intrinsic component of bad faith" and a court's finding on this claim should align with its finding on bad faith).  Thus, the Court incorporates by reference its examination of Plaintiff's bad faith allegations in Section III.D above.  Accepted as true, the allegations throughout the

22

complaint—incorporated by reference in Count Five of the amended complaint—indicate that Liberty's conduct constitutes engagement in the unfair business practice described in § 38a-816(6)(F).

At the same time, Plaintiff has failed to allege adequate facts to plausibly claim that Liberty has a general practice of violating § 38a-816(6)(B–D), (G), and (N).

Plaintiff has not alleged that Liberty violated subsection (B), which prohibits "failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies." Plaintiff's allegations for this provision center on Defendant's failure to accept her November 8, 2023, $25,000 offer of compromise. *Id.* ¶ 15. By statute, such offers remain open to the defendant for 30 days. *See* Conn. Gen. Stat. § 52-192a. As Plaintiff acknowledges, a failure to formally accept the offer within 30 days constitutes a rejection. Thus, by operation of law, Liberty's decision not to accept the offer within that timeframe was an affirmative act communicating its rejection. *See* Conn. Gen. Stat. § 52-192a. Liberty's refusal to accept cannot fairly be described as a failure to "act with reasonable promptness." And even if it *could* be so construed, Plaintiff's complaint alleges that Liberty indeed responded to the offer of compromise, by rejecting it. *See* ECF No. 25 ¶¶ 21–22 (noting "Liberty rejected the November 2023" offer of compromise, and that, "[i]n response to the November 2023 OC, a Liberty adjuster communicated to the Plaintiff's counsel . . . that she would not pay the $25,000 policy limit unless the Plaintiff underwent surgery."). Plaintiff does not allege any facts suggesting Liberty did not "promptly" acknowledge this offer, or any other communications throughout the course of the personal injury action. Thus, she has not plausibly alleged a CUIPA violation under § 816(6)(B).

Likewise, Plaintiff has not plausibly alleged that Liberty violated subsection (C), which prohibits "failing to adopt and implement reasonable standards for the prompt investigation of

23

claims arising under insurance policies," or subsection (D), which prohibits "refusing to pay claims without conducting a reasonable investigation based upon all available information." These claims—generously construed—appear to be premised on the allegation that Plaintiff she submitted a notice of claim to Liberty in September 2022,  ECF No. 25 ¶ 7, and in June 2023, Liberty, through Attorney McCluskey, requested an extension of time to answer the complaint to "complete its investigation."   *Id.* ¶ 12.   Plaintiff alleges no facts supporting that Attorney McCluskey was responsible for investigating Plaintiff's September 2022 claim, or was in any way connected to Liberty's claims-handling process.   The fact that counsel had not completed her investigation by the deadline to respond to Plaintiff's personal injury complaint does not support an inference that Liberty itself had failed to investigate Plaintiff's claim in a prompt manner.

Finally, unlike Plaintiff's claim under subsection (F), the claims under subsections (G) and (N) do appear to be merely a "formulaic recitation" of the statutory provisions.  *Bilyard v. Am. Bankers Ins. Co. of Fla.*, No. 3:20-CV-1059 (JBA), 2021 WL 4291173, at *4 (D. Conn. Sept. 21, 2021).  Subsection (G) prohibits "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds."  Although Plaintiff may stand in the shoes of Mr. Celentano in asserting this violation, the complaint does not explain how Liberty allegedly compels insureds to institute litigation to obtain amounts above what they were offered, or that the insureds then recover substantially more in that litigation—and Plaintiff does not specifically defend this allegation in response to Defendant's motion to dismiss.[9]

Subsection (N) prohibits "failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer

---

[9] Neither party has cited to any cases specifically interpreting subsection (G), and the Court's research indicates that such case law is sparse.

of a compromise settlement." Even assuming that subsection (N) applies in this situation, the facts in the complaint do not plausibly plead that Liberty engaged in prohibited conduct with respect to Plaintiff. The complaint contains very few allegations about Liberty's communications with respect to their rejection of Plaintiff's offer of compromise, stating only that "a Liberty adjuster communicated . . . that she would not pay the $25,000 policy limit unless the Plaintiff underwent surgery." *Id.* ¶ 22. Plaintiff does not offer specific details about the rest of the communications, nor does she allege—even in conclusory fashion—that Liberty failed to provide an explanation for its rejection under the terms of its policy.

Thus, only Plaintiff's allegations under § 38a-816(F) pass muster. The Court proceeds to examine whether Plaintiff has adequately pleaded that Defendant engaged in a general business practice of these types of violations.

### 2. *"General Business Practice"*

Plaintiff has sufficiently alleged sufficient instances of prohibited conduct under § 38a-816(6)(F) to constitute a "general business practice."

CUIPA prohibits "unfair claim settlement practices," when performed "with such frequency as to indicate a general business practice." Conn. Gen. Stat. § 38a-816(6). The law does not define a "general business practice" with reference to a particular number of unfair acts, although a plaintiff must allege "more than a single act of insurance misconduct" and may not assert a claim premised solely on the mishandling of various elements of the same insurance claim. *Klaneski v. State Farm Mut. Auto. Ins. Co.*, 680 F. Supp. 3d 170, 183 (D. Conn. 2023) (citing *Mead v. Burns*, 199 Conn. 651, 666 (1986)); *Falit v. Provident Life & Accident Ins. Co.,* No. 3:09-CV-1593 (CFD), 2010 WL 2710478, at *2 (D. Conn. July 7, 2010) ("It is well settled that a denial of a single claim cannot form the basis of a CUTPA/CUIPA claim, even if the denial involved multiple unfair acts."). Whether a plaintiff has asserted enough similar acts depends upon the facts

25

of each case. *Harrigan,* 214 Conn. App. at 819–20; *Belz*, 46 F. Supp. 3d at 167 ("[T]here is no 'magic number' of other instances that a plaintiff must allege to survive a motion to dismiss on an unfair settlement practices claim under CUIPA through CUTPA's enforcement provision; rather, the allegations must be considered in the context and circumstances presented by the entire complaint").

Plaintiff alleges that Liberty is engaged in a general business practice of unreasonably refusing to accept offers to settle insurance claims where liability is reasonably clear, thereby exposing its insureds to excess judgment. *See* ECF No. 25 ¶ 80 ("Liberty repeatedly refuses to accept offers to settle cases within the policy limits in a manner that needlessly exposes its insureds to excess verdicts."). In support of these allegations, Plaintiff provides three specific examples of Liberty's alleged practice. ECF No. 25 ¶¶ 81–85. Two or three alleged other instances of unfair settlement practices have been considered a sufficient showing at the motion to dismiss stage. *See Belz,* 46 F. Supp. 3d 157 ("Viewing the allegations in the light most favorable to [plaintiffs], the three alleged other instances of unfair settlement practices are sufficient because of the degree of similarity between them and the [plaintiffs'] case, and the fact that [the insurer] has an incentive and mechanism to avoid liability under its current policy language."); *Bilyard*, 2021 WL 4291173, at *3 ("Plaintiff's allegations of a business practice are grounded in two other lawsuits . . . Where Plaintiff relies on other lawsuits in which those plaintiffs alleged similar conduct as Plaintiff alleges here, the Court may draw an inference that Defendant engaged in that conduct with the frequency necessary for a 'business practice' under CUIPA."). Liberty does not argue that invocation of three other examples of the challenged conduct is insufficient at the pleading stage (though it does contest the similarity between those actions and this one). The Court thus finds Plaintiff has accumulated a sufficient number of examples to plausibly plead the existence of a

26

general business practice of refusing to accept offers to settle cases within policy limits in a manner that exposes the insureds to excess verdicts.

The Court also concludes that Plaintiff's proffered examples are sufficiently similar to the present circumstances, such that her CUIPA claim is fairly supported by "more than a single act of insurance misconduct." First, Plaintiff identifies the Connecticut Superior case of *Todd Rios v. Michael Philhower*, where Liberty also purportedly refused a time-limited offer of compromise equal to its policy limits. ECF No. 25 ¶ 81. Plaintiff explains that the material facts of *Rios* are analogous to this case: there, Liberty refused the offer of compromise while in the process of defending its insured against a personal injury action in which liability was reasonably clear. *Id.* In that case, which also involved a car crash, the offer of compromise was likewise tendered a "substantial period of time after the underlying crash." *Id.* Most relevantly, the *Rios* case culminated in a seven-figure jury verdict exceeding the policy limits. *Id.*

For its part, Liberty contends that *Rios* is insufficiently similar to serve as a comparator in this case, because "[t]hat *Rios* involved a rejected offer of compromise and an excess verdict— without more—does not evidence that Liberty Mutual violated Conn. Gen. Stat. § 38a-816(6)." ECF No. 33-1 at 36–37. Liberty offers no legal support for this contention. And, even if it were true, it would not doom Plaintiff's claim at the pleading stage—because Plaintiff *has* pleaded more than just that *Rios* involved a rejected offer of compromise and an excess verdict.

Plaintiff also references the Connecticut Superior Court case *Tracey Mason v. Jessica Szabo*,[10] in connection with which Liberty "wrongly refused to accept an [offer of compromise] for the $25,000 policy limit, despite obvious liability," and a Massachusetts Appeals Court case, *Chiulli v. Liberty Mutual Insurance, Inc.*, where Liberty was found to have engaged in "unfair

---

[10] The proper case caption for this case, based on a review of the Connecticut Superior Court docket, is *Tracey Mason v. Liberty Mutual Ins. Co. et al.*, No. FBT-CV16-6056972-S (Conn. Sup. Ct.).

insurance settlement practices" by knowingly "failing to settle a claim where liability was reasonably clear." ECF No. 25 ¶¶ 82, 85 (cleaned up).

Liberty's argument that a case must involve a finding that CUIPA was violated to be an accurate comparator is likewise inapposite. *See* ECF No. 33-1 at 37 (citing *Rams II, LLC v. Massachusetts Bay Ins. Co.*, No. CV-13-6043177-S, 2015 WL 3554789, at *6 (Conn. Super. Ct. May 11, 2015)). In *Rams II*, the Superior Court found that a plaintiff could permissibly plead a general business practice by "cit[ing] other cases involving a CUIPA action" only if those cases indeed found that CUIPA was violated. 2015 WL 3554789, at *6–7 ("Pleading the fact that other parties have filed suit against the same defendant speaks to the behavior of these other parties and not to the behavior of the defendant."). *Rams II* is not binding on this Court; but in any event, its holding does not change the result here. The value of *Rios*, *Mason*, and *Chiulli* to this analysis is not that they merely show Liberty has been sued. Indeed, Plaintiff has not pleaded that any of the cases involve claims under CUTPA and CUIPA. Instead, *Rios* and *Mason* serve as two documented examples of Liberty's alleged settlement practices supporting the factual inference that Liberty is, indeed, regularly engaging in prohibited behavior. And *Chiulli* indicates that Liberty has been found liable, albeit under another state's laws, for knowingly engaging in "unfair insurance settlement practices" where "liability was reasonably clear." ECF No. 25 ¶ 85. Plaintiff's *Chiulli* example does not suggest the Court should follow the example set by the Massachusetts courts in finding a violation as a matter of law. Rather, for present purposes, *Chiulli* is valuable insofar as it speaks to a third example of similar prohibited conduct. Defendant remains free to challenge the alleged similarity (or lack thereof) of these exemplar cases at summary judgment. *See Metsack v. Liberty Mutual Fire Ins. Co.*, No. 3:14-CV-1150 (VLB), 2015 WL 5797016, at *10 (D. Conn. Sept. 30, 2015).

In sum, Plaintiff has made sufficient allegations to support that Liberty is engaged in a "general business practice" of unreasonably refusing to accept offers to settle insurance claims where liability is reasonably clear, thereby exposing its insureds to excess judgment in violation of § 38a-816(6)(F). Accordingly, the Court finds that, at this stage, Plaintiff has stated a plausible claim for relief under CUTPA for violations of CUIPA under § 38a-816(6)(F). Should Plaintiff wish to amend this count to attempt to state violations of other CUIPA subsections, she may do so consistent with the Court's order below.

## IV.    CONCLUSION

For the reasons described herein, Liberty's motion to dismiss is GRANTED in part, as to Count One, and DENIED in part, as to all other claims. With respect to Count Five, only the violation under § 38a-816(6)(F) survives dismissal. Plaintiff may amend her complaint with respect to Counts One and Five by April 14, 2026. Liberty shall file its answer or other response to any second amended complaint by April 28, 2026.

**SO ORDERED** at Hartford, Connecticut, this 24th day of March, 2026.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE

29